**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| IN RE | ) | Chapter 7 |
| | ) | |
| Harvey Meister, | ) | Case 19-71472 |
| | ) | |
| Debtor. | ) | |

**EMERGENCY MOTION OF CITIZENS BANK OF CHATSWORTH**
**FOR (I) A FINDING THAT THE AUTOMATIC STAY TERMINATED AS A**
**MATTER OF LAW ON DECEMBER 18, 2019, OR**
**(II) CLARIFICATION OF COURT'S VERBAL BUSINESS CESSATION ORDER**

Citizens Bank of Chatsworth (the "Bank"), as the principal secured pre-

petition lender of Harvey Meister (the "Debtor"), the debtor in the above-captioned Chapter

7 case (the "Case"), respectfully moves this Court for the entry of an Order as follows:

(a) finding that, under section 362(h)(1) of the Bankruptcy Code, 11 U.S.C.

362(h)(1), (i) the automatic stay terminated on December 18, 2019, as to the assets (the

"Bank Assets," or the "Assets") of the Debtor in which the Bank possesses a valid and

perfected security interest,[1] and (ii) the Assets are no longer property of the estate;

(b) authorizing the Bank to lease the Bank Assets to the Debtor, or an

affiliate thereof, to resume business in accordance with the Bank's rights under applicable

non-bankruptcy law; and

(c) in the event that the Court denies the foregoing requests, authorizing the

Bank to release funds from the Debtor's post-petition bank account (i) for various expenses

and obligations that the Debtor incurred prior to the close of the hearing on Tuesday,

January 28, 2020, at 10:30 a.m. (the "Hearing"), when the Court directed the Debtor to

cease operating business, and (ii) in the Bank's discretion, for other expenses necessary to

---

[1] As detailed further below, the Bank's Assets consist of substantially all of the assets with which the Debtor was operating its printing business, GDS Professional Business Displays ("GDS"), as a sole proprietorship.

protect the interest of the approximately 20 full and part time GDS employees whose jobs, medical insurance and other benefits, stand in limbo while the Bank seeks to determine the impact of the Court's verbal directive.

In support of its motion (the "Motion"), the Bank states as follows:

## INTRODUCTION AND SUMMARY
### (The Court's Error and the Need for Clarification)

1.     The Bank does not bring this motion lightly: as discussed below, and as the Court rightly determined, the Debtor and the Bank erred in the early stages of this Case; and in more than a decade of practicing before this Court, the Bank's counsel has lost his share of motions, but never once believed, no less asserted, that the Court committed an error of law in its ruling.

2.     The stakes here, however, for the Bank, for the Debtor and for the Debtor's employees, are too high for the Bank (and its counsel) to remain silent and allow the Debtor's business to die without identifying for the Court the unfortunate coincidence of circumstances that resulted in the Court's closure of the Debtor's business.

3.     At the Hearing — which the parties anticipated would be a scheduling conference — on Tuesday, January 28, 2020, on the Trustee's motion for contempt against the Debtor (the "Contempt Motion"), the Court ordered the Debtor's business to close (the "Business Cessation Order," or the "Cessation Order").

4.     The Contempt Motion was somewhat misleading — albeit by no means false — in alleging that the Debtor had used roughly $230,000 of proceeds of pre-petition accounts receivable in operating his business after he filed for Chapter 7 (on October 9, 2019), without explaining (a) that the receivables constituted a portion of the Bank Assets and thus were subject to the Bank's valid and perfected security interests,

such that the bankruptcy estate, and the Debtor's other creditors, <u>suffered no injury whatsoever</u> from the Debtor's conduct, and (b) that no one, including the Trustee or the Office of the United States Trustee, had expressed any concern about the Debtor utilizing the Bank's other collateral to operate the GDS business subsequent to the Petition Date.

5.     The Bank, through its newly retained (undersigned) counsel — whom the Bank had retained precisely because the Bank (albeit believing it had the Trustee's implicit authorization to do so) had played a direct and indirect role in the Debtor's use of his pre-petition receivables — had alluded to the Bank's security interest in the Assets, including the pre-petition receivables, in other filings with the Court prior to the Hearing,

6.     Still, insofar as the Bank was not the subject of the Contempt Motion, the Bank had not had an opportunity either (a) to explain to the Court that the Debtor's and the Bank's conduct had caused no harm to the bankruptcy estate, or (b) to describe why, by the time the Bank had engaged new counsel, an interplay of two relatively obscure provisions of the Bankruptcy Code — i.e., sections 362(h) and 521(a)(2) — had terminated the stay as matter of law as to the Bank's Asset's on December 18, 2019, such that the Debtor could use the Bank Assets, with the Bank's permission, after that date.

7.     What's more, the Bank's counsel was not in attendance at the Hearing because — despite counsel's possessing such a serious concern about the Debtor's error in operating the GDS business post-petition (and his client's participation in those operations) until the stay terminated that he had made arrangements to attend the Hearing in person despite his fractured hip (and in contravention of his doctor's orders) — the Trustee, as an accommodation to the Bank's counsel, had assured counsel that he would present no substantive arguments at the Hearing.

8.     The Trustee honored his commitment not to present substantive arguments at the Hearing.

9.     Still, the Court was so concerned about the Debtor's conduct in operating his business after the bankruptcy filing that, at the conclusion of the Hearing, it issued its verbal Business Cessation Order.

10.     The Court appeared to predicate the Cessation Order on two grounds: (a) that a debtor may not continue to use estate property to operate his prepetition business after filing for Chapter 7 relief; and (b) that the automatic stay remained in place as to the Bank Assets as of the date of the Hearing (so the Debtor was continuing to operate his business in violation of the Bankruptcy Code).

11.     The Court's first premise was clearly correct; that is, inasmuch as all of the Debtor's property (whether or not subject to a lender's or other party's lien) vests in the bankruptcy estate at the instance of a bankruptcy filing, a debtor <u>must cease using it</u> (a) while the trustee determines whether to liquidate it, operate it or abandon it, and (b) where the debtor is operating a business using encumbered property, until the secured party obtains relief from the automatic stay (and, if the secured party then so chooses, sells or leases the property to the debtor to reopen his business).

12.     Yet, the Court's second premise for its ruling — i.e., that the automatic stay remained place at the time of the Hearing — contained an error; to wit, that notwithstanding the confusing, and to some extent inconsistent, aspects of many of BAPCPA's provisions[2] (including those applicable here), the interplay of sections 362(h) and 521(a)(2) of the Bankruptcy Code had resulted in the termination of the automatic stay, <u>and the removal of the Bank Assets from the bankruptcy estate</u>, on December 18, 2019 — <u>30</u>

---

[2]     The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub.L. 109-8, 119 Stat. 23, enacted April 20, 2005).

<u>days</u> after the date that the section 341 meeting commenced in this case (i.e., November 18, 2019).

13.     When the Bank's counsel raised these sections at the Hearing, in an attempt to forestall the Business Cessation Order, the Court (without the benefit of any briefing of the section 362(h) and 521(a)(2) Code provisions) looked to section 521(a)(6) as the provision setting forth the remedy for a violation of section 521(a)(2).

14.     Yet, whereas these three sections certainly overlap under many circumstances, section 521(a)(6) applies only where the debtor's assets secure the purchase price of a lender's allowed secured claim, and thus did not apply here. *See generally In re Williamson*, 540 B.R. 460, 409-411 (Bankr. D.N.M. 2015) (discussing the interrelationship of the three Code provisions).

15.     Section 362(h), on the other hand, represents a "self-executing" consequence of a Debtor's failure to comply with section 521(a)(2)(B) with respect to personal property securing a lender's claim — that is, unless a trustee files a motion under section 362(h)(2) to block the impact of section 521(h) because encumbered assets may be of consequential value to the estate, "[u]nder § 362(h)(1), when [a debtor] fail[s] to perform her duties under . . . §521(a)(2)(B), the <u>[encumbered asset is] removed from property of the bankruptcy estate</u>, and <u>the automatic stay of § 362(a) [is] terminated with respect to the [encumbered asset]</u>." *In re McCray*, 578 B.R. 403, 413 (Bankr. E.D. Mich. 2017) ("legal consequences of such failure came into effect <u>by operation of law</u>") (emphasis added); *In re Seiffert*, 2019 WL 1284299, at *1-2 (Bankr. N.D. Tex. Mar. 8, 2019) (section 362(h)(1) provides a "self-executing remedy" for violation of section 521(a)(2)(B)).

16.     As a result, by the time of the Hearing, the Bank possessed control over the Bank Assets (i.e., the Debtor's business assets), and had the right under its loan

documents and other applicable non-bankruptcy law to allow the Debtor to use those assets in the operation of his business.

17.     Accordingly, while the Debtor (and perhaps even the Bank) remain subject to potential sanctions for the Debtor's violations of the automatic stay and other provisions of the Bankruptcy Code during the first ten weeks of the Case, no need exists at this juncture to shutter forever the Debtor's business (and cause the loss of numerous jobs and a customer for its numerous vendors and other creditors).

18.     To be sure, the Debtor's business may yet fail: the Bank does not intend to allow the Debtor use its collateral indefinitely; and the sanctions that the Court imposes against the Debtor (or the Debtor's failure to obtain a discharge) may render the Debtor unable to satisfy the requirements for reaffirming the Bank's debt.[3]

19.     At this juncture, however, the stay has been lifted as to the Bank Assets, such Assets are no longer property of the Debtor's bankruptcy estate, and the Bank should have the ability to use the Assets as it deems necessary and appropriate to

---

[3]     Although the Court noted at the Hearing that the Debtor (in an agreed motion with the Bank) had obtained an extension of the time period for the Debtor to reaffirm the Bank's debt, that motion, and the Court's order granting it, were entered on December 30, 2019, 12 days <u>after</u> the automatic stay had been lifted as a matter of law under section 362(h)(1).  Thus, this extension could not "unwind" the self-executing consequence of section 362(h)(1) arising from the Debtor's failure to satisfy its obligations under section 521(a)(2) by December 18, 2019.  *See In re McCray*, 578 B.R. at 413; 441 B.R. 108, 112 (Bankr. N.D. Ill. 2010) ("Since the same stay obviously cannot terminate twice, and there is no provision to reinstate the stay after thirty days and before forty-five days, the timeframe provision of (a)(6) would be irrelevant.").  Still, as the *McCray* Court explained, because section 362(h) provides the exclusive consequences for a violation of section 521(a)(2), a debtor may reaffirm a debt pursuant to section 524(c) notwithstanding his violation of section 521(a)(2), so long as the creditor agrees to accept such reaffirmation in lieu of exercising its rights under its loan documents and applicable non-bankruptcy law. *In re McCray*, 578 B.R. at 414.

maximize its return on their value, including authorizing the Debtor to use them to operate his business and preserve the Assets' going concern value.

20. Finally, if the Court does not grant the foregoing relief, the Bank (desperately) requires clarification as to the import of the Court's ruling on the Debtor's funds that the Bank is holding in the Debtor's bank account; that is, may the Bank release funds (a) for checks and other draws against the funds that the Debtor commenced prior to the Business Cessation Order, (b) for expenditures that the law requires the Debtor to make (such as payroll and payroll taxes) for the period prior to the Business Cessation Order, (c) for payments that the Debtor needs to make to continue the health insurance for its employees, and (d) for expenses that the Debtor needs to pay to protect the Bank's collateral?

## FACTUAL AND PROCEDURAL BACKGROUND[4]

21. On October 9, 2019 ("Petition Date"), the Debtor commenced the Case by filing a voluntary petition (the "Petition") for relief under Chapter 7 of the Bankruptcy Code.

22. Prior to the Petition Date, the Debtor operated a printing business, under the name GDS Professional Business Displays ("GDS"), as a sole proprietorship.

23. Commencing in late December 2011, the Bank entered into four loan facilities with the Debtors (each, a "Loan," and collectively, the "Loans"), as summarized in

---

[4]     The Bank has predicated the vast portion of the background fact set forth in this Motion on Court filings and documents within the Bank's possession.  Still, a limited number of the Bank's statements come from reports that the Bank received from the Debtor, but has not yet verified.  Obviously, were the Bank to discover that any of the information that the Debtor provided to it is incorrect, the Bank's position as to its intended use of its collateral might vary from its current intention as set forth herein.

Exhibit A hereto. Each Loan was secured by the Bank Assets.[5] *See* Claims Register (Proof of Claim No. 1, filed November 4, 2019, a copy which is attached hereto as Exhibit B (the "Bank POC"); *see also* Security Agreement dated December 29, 2011, between the Bank and the Debtor, a copy of which is attached hereto as Exhibit C.[6]

24.     As of the Petition Date, (a) the Debtor owed the Bank a total of approximately $860,000 (the "Bank Claim") under the four Loans, and (b) possessed a valid and perfected first priority security interest in the Assets that secured each of the Loans. *See* Bank POC.

25.     Prior to the Petition Date, under a series of forbearance agreements between the Bank and the Debtor commencing in 2016 on account of the Debtor's breach of his obligations under the Loan Documents, the Debtor was depositing the proceeds of all of

---

[5]     The Bank's "blanket" security interest, as set forth in the security agreements for each of the Loans, specifically encompasses (but is not necessarily limited to) all tangible and intangible business assets of the Debtor, including the following (and the "proceeds" of each):

>    All of the Debtor's equipment;
>    All of the Debtor's fixtures;
>    All of the Debtor's inventory;
>    All of the Debtor's accounts receivable;
>    All of the Debtor's contract rights;
>    The Debtor's business or trade names;
>    All of the Debtor's accounts;
>    The Debtor's customer lists; and
>    The Debtor's interests in computer software, servers or websites.

[6]     As reflected in the attachments to the Bank POC, the notes for the three other loans consisted of combined loans and security agreements, thereby granting the Bank Security Interests in all of the Assets within a single document. The SBA Loan, by contrast, consisted of (among other documents) a Note that identified the Assets as the collateral for the Loan, and a separate Security Agreement that contained the requisite "granting language" creating the Security Interests as security for the SBA Loan. Exhibit C is the Security Agreement, executed by the Bank and the Debtor.

the Debtor's receivables into a separate, segregated account (the "Lockbox"), with the Bank then funding a Deposit Account with which the Debtor would operate his company.

26.     On or about the Petition Date, the Debtor opened a new account at the Bank (the "Debtor Account"), and began depositing all of the proceeds of his receivables (pre- and post-petition) into the Debtor Account, and began using these funds to operate his business.

27.     Substantially concurrently with the filing of the Petition, the Court (a) issued a "Notice of Chapter 7 Bankruptcy Case — No Proof of Claim Deadline," (b) scheduled the first meeting of creditors under Section 341 of the Bankruptcy Code for November 18, 2019 (the "Section 341 Meeting"), and (c) appointed Jeffrey Richardson as the Chapter 7 trustee (the "Trustee").

28.     Under Bankruptcy Rules 4004(a) and 4008(a), the setting of the Section 341 Meeting for November 18, 2019, resulted in the establishment of January 17, 2019, as the deadlines for, respectively, (a) complaints objecting to the Debtor's discharge pursuant to section 727 of the Bankruptcy Code, and (b) the filing of a reaffirmation agreement under section 524(c) of the Bankruptcy Code.

29.     On October 22, 2019, the Debtor filed his schedules and statements in the Case (the "Schedules").

30.     The Schedules included Official Form 108 (Statement of Intention for Individuals Filing Under Chapter 7), a copy of which is attached hereto as Exhibit D (the "Intention Statement").

31.     As required by section 521(a)(2)(A) of the Bankruptcy Code, the Intention Statement set forth the Debtor's intentions with respect to the Assets — to wit,

that the Debtor intended to "Retain the [Assets] and enter into a *Reaffirmation Agreement* [with the Bank]."  Exhibit D at 1 (italics in original).

32.    The Intention Statement did not state that the Debtor intended to reaffirm the Loans under their original terms.

33.    The Section 341 Meeting commenced on November 18, 2019 (the "November 2019 Session").

34.    During the November 2019 Session, the Debtor informed the Trustee, among other things, (a) that the Debtor had been continuing to operate the GDS business using the Assets, and (b) that the Debtor had been using the proceeds of his pre-petition receivables to operate GDS.

35.    The Debtor also informed the Trustee that the Bank had released limited funds from the Lockbox into the Debtor Account to enable the Debtor to pay his employees certain other critical bills for which the Debtor had insufficient funds in his account.

36.    The Trustee adjourned the November 2019 Session without closing the Section 341 Meeting, asked the Debtor to provide the Trustee with additional documentation relating to the use of the pre-petition receivables, and indicated to the Debtor that he should cease using the proceeds of the pre-petition receivables.

37.    The Trustee, however, did not tell the Debtor that he should shut down his business; quite the contrary, the Trustee, who was aware that the Debtor had been operating his business using the Bank's collateral since the Petition Date, indicated that the Debtor could continue to do so.

38.    On November 19, 2019, the adjourned meeting was scheduled for December 16, 2019.

39.     On November 20, 2019, the Trustee requested that the Court set a bar date for proofs of claim.

40.     That same day, the Court schedule February 20, 2020, as the bar date.

41.     On December 11, 2019, the Court entered an Order further adjourning the Section 341 Meeting to January 13, 2020.

42.     Although section 521(a)(2)(B) required the Debtor to perform his intention with respect to the Assets, as stated in the Intention Statement, within 30 of the November 2019 Session (i.e., by December 18, 2019), the Debtor failed to do so.

43.     In addition, because the Trustee believed that the value of the Bank Assets was less than the Bank's claim — i.e., the Bank Assets (which included the pre-petition receivables were of inconsequential value to the bankruptcy estate — the Trustee opted not to file a motion seeking to preserve the automatic stay after December 18, 2019.

44.     As a result, on that day, as noted above and discussed further below, the automatic stay was lifted as to the Bank Assets, and the Assets were removed from the bankruptcy estate.  11 U.S.C. §362(h)(1).

45.     Under Rule 4004(a) and 4008(a), the adjournments of the Section 341 Meeting did not alter the January 17, 2020, deadline for filing (a) objections to the Debtor's discharge, or (b) reaffirmation agreements.

46.     On account of the concerns that the Trustee raised at the November 2019 Session regarding the Debtor's use of pre-petition receivables to operate his business after the Petition Date, and the fact that the Bank had allowed the Debtor to use limited

Lockbox funds for such purposes,[7] the Bank determined that it should retain an attorney with substantial bankruptcy experience to represent its interest in the Case.

47.     On December 22, 2019, Mr. Backman filed his appearance for the Bank in the Case.

48.     Shortly thereafter, the Bank, via Mr. Backman, reached an agreement with the Debtor's counsel to seek an extension of the January 17, 2020, deadline for filing reaffirmation agreements with respect to the Loans.

49.     On December 30, 2019, the Bank and the Debtor filed an agreed motion to extend the deadline for filing the Debtor's filing of a reaffirmation agreement as to the Bank Claim, and the Court entered an Order the same day extending the reaffirmation agreement deadline to February 16, 2020.

50.     On January 13, 2020, the Section 341 meeting resumed for a brief session, and concluded that same day (the "January 2020 Session").

51.     Because the Debtor has not yet provided the Trustee with all of the reports that the Trustee had requested at the November 2019 Session, and also had made comments suggesting that the Debtor may have used the pre-petition receivables for purposes other than the operation of the GDS business, the Trustee requested that the

---

[7]     In the Introduction and Summary above, the Bank noted that the Bank has played a "direct and indirect" role in the Debtor's use of the pre-petition receivables based on its understanding that the Trustee did not have an issue with the Debtor continuing to operate its business.  The Bank's "direct" role involved its transfers, all prior to the November 2019 Session, of funds from the Lockbox into the Debtor's post-petition bank account to pay his payroll and certain other bills critical expenses to suppliers to enable the Debtor to continue his business.  The "indirect" role consisted of the Bank's establishment of a single post-petition account into which he deposited both pre- and post-petition receivables proceeds, such that the Debtor, in using the funds from the account, necessarily was using the proceeds of pre-petition as well as post-petition receivables.

Debtor provide the Trustee with the reports, and certain other documentation, within two weeks of the January 2020 Session.

52.     As for the Bank, which had ceased funding the Debtor Account as of the November 2019 Session, it too asked that the Debtor provide it with copies of the reports that the Trustee had requested, as well as certain additional information.

53.     On January 16, 2020, the Trustee filed two motions:

a.     The Contempt Motion; and

b.     A motion (on behalf of himself and the United States Trustee only) to extend the time to object to the Debtor's discharge (on the grounds that the Debtor improperly used the pre-petition receivables) from January 17, 2020, to March 17, 2020.

54.     That same day, the Court entered an Order scheduling the Contempt Motion for the Hearing on January 28, 2020, at 9:00 a.m.

55.     As discussed in the Introduction above, on January 17, 2020, the Bank's counsel, after learning from the Debtor's counsel, and then receiving the Trustee's assurance that the Trustee would not be presenting substantive argument at the Hearing, requested and received the Court's permission to appear telephonically at the Hearing.

56.     Nevertheless, based on the allegations of the Contempt Motion, and the information that the Trustee and the Debtor's counsel presented to the Court at the Hearing, the Court verbally pronounced the Business Cessation Order, and directed the Debtor to close its business immediately.

57.     In the period since the Hearing, the Bank has determined, to the best of its knowledge and belief, that (a) during the period between the Petition Date and the November 2019 Session of the Section 341 Meeting, the Debtor used approximately

$200,000 of his pre-petition receivables to operate the GDS business,[8] (b) during the period between November 2019 Session and the January 2020 Session, the Debtor used an additional approximately $30,000 of his pre-petition receivables for the same purpose, (c) the Debtor has only approximately $7,000 of pre-petition receivables outstanding, and (d) as of the date of this Motion, the Debtor has outstanding receivables of $250,000.

58.     The Bank also has determined that, during the period between the Petition Date and the November 2019 Session, it transferred approximately $35,000 from the Lockbox to the Debtor Account, for payroll and the payment of certain ACH draws by the Debtor's vendors.

59.     As indicated above, the Bank possessed a valid and perfected security interest on all of the pre-petition receivables that the Debtor used subsequent to the Petition Date; thus, <u>neither the bankruptcy estate nor the Debtor's other creditors suffered any harm from the Debtor's (improper) use of these receivables</u>.

60.     Rather, the only party that has been harmed by the Debtor's misconduct — the nature and extent of which the Bank is still investigating — is the Bank.

61.     In the days following the Business Cessation Order, the Bank received checks and other draws on the Debtor Account.

62.     Although the Business Cessation Order had imposed no direct constraints on the Bank's release of funds from the Debtor Account, the Bank, in consultation with its counsel, determined that it would honor draws on the account that the

---

[8]     The Debtor's use of the pre-petition receivables "to operate the GDS business" includes the Debtor's "payment" to himself of "draws" from the business — i.e., to an account that the Debtor owns at Commerce Bank — as his compensation as the business owner.  The Debtor's records reflect that, during the four months since the Petition Date, he was taken only approximately $14,000 in draws from the Bank's post-petition GDS account for his personal use.

Debtor had initiated prior to the Business Cessation Order, but not honor any draws the Debtor might make after such Order (because any such draw would violate the Business Cessation Order).

63.     The Bank does not believe that the Debtor has intentionally initiated any draws on the Debtor Account since the Hearing.

64.     Still, as a result of the uncertainty of the scope of the Business Cessation Order, and the protocol that the Bank has adopted in face of that Order, the Debtor (a) has not paid his employees for the work week ending on January 26, 2020, two days prior to the Business Cessation Order, (b) has not paid any bills due to suppliers since the Business Cessation Order, and (c) has not made the insurance payment due February 1, 2020, for the employee's health coverage, so as of that date, the employees may not obtain approval for any medical bills they incur after that date.

## ARGUMENT

**I.     Whereas the Court Correctly Ruled that the Debtor Violated the Bankruptcy Code By Continuing to Operate His Business after Petition Date, the Court Erred in Entering the Business Cessation Order Because Section 362(h) of the Bankruptcy Code Terminated the Automatic Stay, and Removed the Bank Assets from the Bankruptcy Estate, on December 18, 2019.**

65.     As set forth in the Introduction above, no question exists that the Debtor lacked the authority to continue operating his business in the immediate aftermath of the Petition Date.

66.     At that point, all of the Debtor's assets — including the Bank Assets — vested in his bankruptcy estate.  The Trustee alone then possessed the authority to (a) investigate their value, (b) liquidate them, (c) move to abandon them to the Debtor or, (d) in unusual circumstances, operate them for the benefit of the Debtor's creditors.

15

67.     Furthermore, the Trustee's powers with respect to the Debtor's assets — again, including the Bank Assets — would continue until either (a) the automatic stay terminated as to some or all of the assets terminated as a matter of law, or (b) a secured lender (here, the Bank) moved for and obtain relief from the stay (generally, except in certain cases involving real property) pursuant section 362(d)(2).

68.     Ordinarily, the automatic stay terminates as a matter of law only under section 362(c) (stay terminates with respect to property when it is no longer property of the estate and as to any other act when the case is closed or dismissed, or the debtor's discharge is granted or denied).

69.     Nevertheless, section 362(h), which was added to section 362 in 2005 upon the passage of BAPCPA, fills a gap that had existed regarding an individual debtor's obligations to state and perform his or her intentions with respect to personal property that serves as collateral for a secured lender's loan.

70.     Even prior to BAPCPA, section 521(a)(2) of the Bankruptcy Code had required that, in an individual bankruptcy case, the debtor must (a) file a Statement of Intention as to whether he intends to "surrender or retain" property that secures a claim with the earlier of 30 days from the Petition Date or the date set forth section 341 meeting, and (b) perform his intention as set forth in the Statement of Intention within 30 days of the date set for the section 341 meeting.

71.     Yet, section 521(a)(2) had imposed no consequences on a debtor who failed to comply with its terms.

72.     The addition of section 362(h) in 2005, however, significantly strengthened the import of section 521(a)(2) by "provid[ing] for two legal consequences, without the need for a motion or any other process, when an individual debtor fails to

16

timely perform their duties imposed by § 521(a)(2)(A) and (B) with respect to personal property that secures a debt." *In re McCray, supra,*

73. That is, under section 362(h), if a debtor fails <u>both</u> (a) to timely file his Intention Statement, <u>and</u> (b) to "take timely the action specified in such statement, as it may be amended before expiration of the period for taking action." 11 U.S.C. §362(h)(1), then the automatic stay "is <u>terminated with respect to personal property of the estate or of the debtor securing in whole or in part a claim</u> . . . and such personal property shall no longer be property of the estate." *Id.*; *In re McCray*, supra ("following BAPCPA, the Bankruptcy Code now expressly provides at least some legal consequences that flow from an individual debtor's failure to timely perform their duties under § 521(a)(2) with respect to personal property that secures a debt: under § 362(h)(1) the property is removed from the bankruptcy estate, the automatic stay is lifted, and the creditor is free to enforce its rights under applicable non-bankruptcy law with respect to such property").

74. Only two exceptions exist to the consequence of a debtor's failure to comply with section 521(a)(2):

      a. under the so-called "Unless Clause" of section 362(a)(1)(B), a Debtor's failure to perform his intentions pursuant to section 521(a)(2)(B) gives rise to section 362(h)(1)'s consequences "unless" the (i) Intention Statement "specifies the debtor's intention to reaffirm [the] debt <u>on the original contract terms</u>," and (ii) "the creditor refuses to agree to the reaffirmation on such terms (11 U.S.C. §362(h)(1)); and

      b. under section 362(h)(2), the lifting of the stay and the removal of the encumbered property from the bankruptcy estate will be suspended if the trustee files a motion <u>before the expiration of the applicable time periods of section</u>

<u>521(a)(2)(A) and (B)</u>, and the court determines, after notice and hearing, that the encumbered "personal property is of consequential value or benefit to the estate, . . . orders appropriate adequate protection of the creditor's interest, and orders the debtor to deliver any collateral in the debtor's possession to the trustee." 11 U.S.C. §362(h)(2).

75.     The courts that have examined the somewhat complex — even convoluted — interplay of sections 362(h) and 521(a)(2) uniformly have agreed that, where applicable, section 362(h)(1)'s remedies for a violation of section 521(a)(2) occur are "self-executing" and arise "as a matter of law." *In re McCray*, *supra*, 578 B.R. at 413 ("legal consequences of [the failure to comply with sections 521(a)(2)] came into effect by operation of law") (emphasis added); *In re Seiffert*, *supra*. 2019 WL 1284299, at *1-2 (section 362(h)(1) provides a "self-executing remedy" for violation of section 521(a)(2)(B)); *see also In re Blixseth*, 684 F.3d 865, 872 (9th Cir. 2012) (holding that "the combined effect of §§362(h) and 521(a)(2) is to lift the stay and remove personal property from the estate when no timely statement of intention is filed and a trustee fails to timely file a motion to determine the value or benefit of the property," and noting that although the "result may be harsh[, it] is not absurd").[9]

_____

[9]     As noted above, BAPCPA also added to section 521(a)(6), the Code provision to which the Court referred when the Bank's counsel interjected during the Hearing that the Bank Assets were no longer property of the estate, a "hanging paragraph" — i.e., so called "because of its seemingly random placement in the text of the statute" — that provides the same relief as section 362(h)(1) for a violation of section 521(a)(6)'s terms.  The latter section somewhat awkwardly provides that one of the Debtor's duties is to "not retain possession of personal property as to which a creditor has an allowed secured claim <u>for the purchase price</u> secured in whole in or part by an interest in such personal property unless the debtor, <u>not later than 45 days after [the section 341 meeting]</u> either (a) enters into a reaffirmation agreement with the secured lender, or (b) redeems the property."  11 U.S.C. §521(a)(6) (emphasis added).

(continued...)

76.     The case law also holds that, even where a secured creditor would prefer that a debtor who has stated his intention to reaffirm the debt pursuant to section 521(a)(1)(A), but has failed to do so under section 521(a)(2)(B), perform his intention, the decision whether to do so lies with the debtor, and if the debtor does not, then the secured creditor not only may, but must, rely on its rights under non-bankruptcy law. *See In re McCray*, supra, 578 B.R. at 413 and *In re Williamson*, *infra*, 540 B.R. at 468 (both holding, after extensive discussions of sections 362(h) and 521(a)(2), that a creditor's sole remedy following a debtor's failure to comply with either subparagraph of section 521(a)(2) is to pursue its rights under its loan documents and other non-bankruptcy law).

---

[9](...continued)

Under <u>some</u> circumstances, section 362(h) and section 521(a)(6) <u>may</u> overlap — e.g., where (i) a secured creditor possesses a purchase money security interest, (ii) the secured creditor has filed a proof of claims (thereby providing it with an "allowed claim", and (iii) the debtor has not entered into a reaffirmation agreement after stating an intention to do so — with the bizarre result that the automatic stay may terminate twice (i.e., after 30 days under section 362(h) and then after 45 days under section 521(a)(6)). *See In re Molnar*, 441 B.R. 108, 111 (Bankr. N.D. Ill. 2010) (noting that "the interplay" of sections 362(h) and section 521(a)(6) "have been found confusing") (citing *In re Donald*, 343 B.R. 524, 529 (Bankr.E.D.N.C.2006) ("[d]eciphering this puzzle is like trying to solve a Rubik's Cube that arrived with a manufacturer's defect"). Yet, the two "provisions differ in a number of ways," *In re Molnar*, *supra*, 441 B.R. at 112, at least one, and possibly more, of which apply here.

Most clearly, section 521(a)(6) does not pertain here because the Bank's security interest in the Bank Assets do not secure the purchase price of the Assets; instead the Loans (or at least several of them) provided working capital for the GDS business. In addition, unlike section 521(a)(2)(B), which requires the debtor to perform is intention within 30 days after the date "set" for the meeting of creditors, section 521(a)(6)'s 45-day deadline runs from the date of the section 341 meeting, which did not conclude here until January 13, 2020. *See* id. at 112; *In re McCray*, *supra*, 578 B.R. 410-411. Moreover, even if both sections applied here, section 521(a)(6) would not delay the effective date of section 362(h)'s consequences since, in circumstances where both sections arguably apply, section 362(h)'s earlier 30-day period controls. *In re Molnar*, 441 B.R. at 112 ("Since the same stay obviously cannot terminate twice, and there is no provision to reinstate the stay after thirty days and before forty-five days, the timeframe provision of (a)(6) would be irrelevant.").

77.     Here, the Debtor timely filed his Intention Statement, stating that he intended to retain the Bank Assets and reaffirm the Loans.

78.     The Debtor, however. did not perform his stated intention — i.e., reaffirmation of the Loans — within 30 days of the November 2019 Session.

79.     Nor did the Debtor invoke the "Unless Clause" by stating, either in the Intention Statement or to the Bank, that he intended to reaffirm the Loans under their original contractual terms; on the contrary, the Debtor proposed reducing the interest rate on all of the Loans to 2.5% per annum.

80.     Finally, the Trustee, believing that the Bank Claim was substantially undersecured, did not file a motion under section 362(h)(2) seeking to forestall section 362(h)(1)'s self-executing remedies for a secured creditor, on the grounds that the Bank Assets (including the Debtor's hard assets, pre-petition receivables, inventory and other intangible assets) were of consequential value or other benefit to the estate,

81.     Accordingly, as of December 18, 2019, the Bank Assets were removed from the estate "by operation of law" and the Bank was free to exercise its non-bankruptcy law remedies.

82.     These remedies include, among many others, selling <u>or leasing</u> the Bank Assets in a public or private transaction.  *See* Exhibit B (Bank POC Attachment 1 at 5 of 12) (SBA Note at 4/6 §5(E)); 810 ILCS 5/9-610(a) ("After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.").

83.     The Bank remains hopeful that the Debtor ultimately will be able to reaffirm the Bank Claim in exchange for retaining the Bank Assets, and ultimately repay his debt to the Bank under the Loans.

84.     Nevertheless, in the interim, the Bank cannot continue to, nor is it obligated to, allow the Debtor to continue using the Bank's collateral for no charge; hence, the Bank intends to lease the Bank Assets to the Debtor for a reasonable charge, and apply the payments to the Bank Claim.

85.     The Bank therefore requests that the Court (a) find that the automatic stay terminated as a matter of law and that the Bank Assets are no longer property of the estate, and (b) withdraw its Business Cessation Order so that (if the Bank so chooses in exercising its rights as secured lender), the Bank may lease the Assets to the Debtor and enable the Debtor to resume his business, and pay and return his employees to work.

## II.     If the Court Does Not Lift the Business Cessation Order, Then the Bank (And the Debtor) Require Clarification of the Order In Order to Determine What Payments The Debtor May Make and the Bank May Honor.

86.     During the period since the Court verbally directed the Debtor to cease doing business, the Bank has struggled on a daily basis to determine what checks, ACH draws and other withdrawals from the Debtor's account the Bank may honor.

87.     Immediately upon the termination of the January 28 Hearing, the Debtor's counsel advised the Debtor of the Court's ruling, and instructed it that, in order to avoid complicity with any potential intentional or inadvertent violation of the Business Cessation Order, the Bank should not honor any draw on the Debtor's post-petition bank account that the Debtor initiated or appeared to initiate subsequent to the Hearing.

88.     At the same time, after literally hours of consultations stretching over several days, the Bank has decided that it should — indeed, arguably must — honor checks and other draws on the account that the Debtor initiated prior to Hearing, such as checks

that the Debtor had written prior to the Hearing, but that the Bank did not receive for payment until after the Hearing.

89.     The Bank does not believe that the Debtor has knowingly made any effort to draw funds from his account since the Hearing, and until Tuesday, February 4, 2020, the Bank had honored less than $2,000 total of combined checks that the Debtor plainly wrote prior to the Hearing, while declining to honor only a few draws on the account that one of the Debtor's employees, on the morning following the Hearing, appeared to have initiated to Ameren to avoid the cessation of electrical service to the Debtor's business facility (with the Bank dishonoring the draws only upon receiving assurances from the Debtor's counsel that the dishonor of these payments would not result in the termination of service to the Debtor).

90.     Yet, as the days pass, issues continue to arise as to how the Bank should be complying with the Court's order.

91.     For example, the Debtor has several vendors that receive payment through automatic ACH pulls from the Debtor's account on a specific date of each month.

92.     Again, whereas the Bank is treading carefully in seeking not to make any payment for work that the Debtor may have performed after the Business Cessation Order, the Bank's obligation to its customers to honor draws on his account, absent an Order directing it not to do so, has caused the Debtor to honor a few thousand dollars of ACH draws by the Debtor's vendors — such as UPS — for services they performed prior to the Business Cessation Order.

93.     Moreover, and more important, the Debtor has not issued payroll for the workweek ending January 26, 2020, two days before the Hearing. Nor has the Debtor paid the medical insurance premium, due for its employees.

94.     Whereas the Debtor, in an abundance of caution, apparently has not paid its payroll, or the insurance premiums, the Bank (and the Debtor) require direction as to whether such payments may be issues, and if presented for payment, honored.

95.     Indeed, the Bank has apprized the Debtor (through counsel) that, if the Bank received for payment a payroll check <u>for work that an employee performed prior to Business Cessation Order</u>, then the Bank would feel compelled to honor it.

96.     Obviously, then, if the Court does not authorize the Debtor to resume business, the Bank requires guidance, via a formal Court order, as to how the Business Cessation Order applies to it.

WHEREFORE, the Bank respectfully prays that the Court enter an Order, on an emergency basis, (i) finding that the automatic stay terminated as a matter of law as to the Bank Assets on December 18, 2019, (ii) that the Bank Assets no longer are property of the Debtor's bankruptcy estate, (iii) that the Bank may exercise its non-bankruptcy law remedies with respect to the Bank Assets, including (if the Bank opts to do so) leasing the Assets to the Debtor to resume his business, (iv) setting forth the Bank's right, obligations and limitations with respect to the Debtor's funds that are on deposit in the Debtor's bank account at the Bank, and (v) granting the Bank such other and further relief as the Court deems appropriate.

Dated:  February 7, 2020

Respectfully submitted,


By:   /s/ Jonathan A. Backman

Jonathan A. Backman
Law Office of Jonathan A. Backman
117 N. Center Street
Bloomington, Illinois 61701-5001
(309) 820-7420
FAX: (309) 820-7430
jbackman@backlawoffice.com

*One of the Attorneys for Citizens Bank of Chatsworth*

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan A. Backman, an Illinois attorney, hereby certify that on February 7, 2020, I electronically filed the foregoing **Emergency Motion of Citizens Bank of Chatsworth for (I) a Finding That the Automatic Stay Terminated as a Matter of Law on December 18, 2019, or (II) Clarification of Court's Verbal Business Cessation Order** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Debra Babu on behalf of Creditor Sterling National Bank
ddevassy@askounisdarcy.com, sshropshire@askounisdarcy.com

Jonathan A. Backman on behalf of Creditor Citizens Bank of Chatsworth
jabackman@backlawoffice.com, ebackman@backlawoffice.com

James T. Finegan on behalf of Debtor Harvey Meister
jasfin@aol.com, fineganbankruptcylaw@yahoo.com;rfinegan@gmail.com

Jeffrey E. Krumpe on behalf of Creditor Citizens Bank of Chatsworth
jeffrey.krumpe@mhtlaw.com, jeffrey.krumpe@mhtlaw.com

Nisha Bhupendra Parikh on behalf of Creditor CitiMortgage, Inc.
bankruptcyteam@fal-illinois.com

Jeffrey D. Richardson
jdrdec@aol.com, il37@ecfcbis.com

Jeffrey D. Richardson on behalf of Trustee Jeffrey D. Richardson
jdrdec@aol.com

Laura Richardson on behalf of Trustee Jeffrey D. Richardson
lauraerichardson@hotmail.com

U.S. Trustee
USTPRegion10.PE.ECF@usdoj.gov


  /s/ Jonathan A. Backman